AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

**LODGED**
CLERK, U.S. DISTRICT COURT

03/19/2021

CENTRAL DISTRICT OF CALIFORNIA
BY: ___ DVE ___ DEPUTY

**FILED**

Mar 19, 2021

CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY ___Nancy Barba___
Deputy Clerk. U.S. District Court

United States of America

v.

WESLEY NORRIS,

Defendant.

Case No.   8:21-mj-00198-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 10, 2021 in the county of Orange in the Central District of California, the

defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of a Firearm and Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
Meagan M. Buckley
*Complainant's signature*

_____
Meagan M. Buckley, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   March 19, 2021          **DOUGLAS F. McCORMICK**
_____          _____
*Judge's signature*

City and state:   Santa Ana, California     Hon. Douglas F. McCormick, U.S. Magistrate Judge
_____          *Printed name and title*

AUSA: G. Scally (x3592)

## AFFIDAVIT

I, Meagan M. Buckley, being duly sworn, declare and state as follows:

## I.   INTRODUCTION

1.   I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since June 2016. I received basic law enforcement training at the FBI Academy in Quantico, Virginia from June 2016 to November 2016.  This training included segments on conducting criminal investigations, narcotics identification, gangs, and other law enforcement topics.  From December 2016 to January 2021, I was assigned to the Los Angeles Metropolitan Task Force on Violent Gangs ("LAMTFVG") conducting investigations of the Mara Salvatrucha criminal street gang ("MS-13"). Since January 2021, I have been assigned to the Orange County Violent Gang Task Force (OCVGTF), which is a multi-agency task force investigating the criminal activities of violent gangs in the Orange County area.

2.   Prior to working for the FBI, I was an Assistant District Attorney with the Essex County District Attorney's Office in Salem, Massachusetts from March 2014 to June 2016. During this time, I was assigned to work fugitive, narcotic, firearm, and gang prosecutions as well as general crimes.

3.   During my tenure with the FBI, I have participated in numerous investigations of violent crime, drug trafficking organizations, and large-scale street gangs, including criminal enterprise investigations that have involved court-authorized

interception of wire, oral, and electronic communications.  I
have participated in the investigation and prosecution of
Racketeer Influenced and Corrupt Organization Act ("RICO")
violations in this district.  I have become familiar with the
methods, language, structures, and criminal activities of street
gangs and transnational gangs operating in and through this
judicial district.  I have become familiar with the street and
leadership level extortion collection activities of these gangs.
I have become familiar with the types and amount of profit made
by narcotics smugglers and the methods, language, and terms
which are used to disguise the source and nature of the profits
from their illegal narcotic dealings.

　　　4.　　During the course of my career, I have personally
interviewed numerous gang members and narcotics traffickers in
the gang and narcotics criminal enterprise investigations I have
worked.  I have participated in the debriefing of cooperating
defendants, witnesses, confidential human sources, and
defendants who had personal knowledge regarding criminal street
gang activity, major narcotics trafficking organizations, and
other criminal offenses, including violent crimes.  Through
these efforts, I have become very familiar with the methods used
by gang members and narcotics traffickers.  Specifically, I have
become knowledgeable about the investigative techniques that are
useful and viable in certain situations and those that are not.
I have also consulted with other investigators who have
extensive training and experience in criminal enterprises and
financial investigations.  I have executed numerous search

warrants for gang and narcotics investigations seeking evidence of the trafficking of controlled substances, weapons violations, gang indicia, and violent crimes.

## II. **PURPOSE OF AFFIDAVIT**

5.   This affidavit is made in support of a criminal complaint against Wesley Norris ("NORRIS") for a violation of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm and Ammunition.

6.   This affidavit is also made in support of an application for a warrant to search 28 digital devices (collectively, the "SUBJECT DEVICES"), in the custody of the Federal Bureau of Investigation, in Orange, California, as described more fully below and in Attachment A.

7.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1), Felon in Possession of a Firearm, and 18 U.S.C. § 1028A, Aggravated Identity Theft (the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

8.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint andwarrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically

indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>PROPERTY TO BE SEARCHED</u>

9.    The property to be searched is the following digital devices (collectively, the "SUBJECT DEVICES"), seized on February 10, 2021 and currently maintained in the custody of the Federal Bureau of Investigation in Orange, California:

a.    Samsung Galaxy S9+ cellular telephone, Serial Number 353321091776420 ("SUBJECT DEVICE 1");

b.    Black iPhone ("SUBJECT DEVICE 2");

c.    Dell Laptop computer, Serial Number 3431819198 ("SUBJECT DEVICE 3");

d.    Lenovo Laptop computer, Serial Number removed ("SUBJECT DEVICE 4");

e.    Apple iMac Desktop ("SUBJECT DEVICE 5");

f.    Zebra Handheld Computer, Serial Number 18254522506393 ("SUBJECT DEVICE 6");

g.    Black USB with Wireless Insert ("SUBJECT DEVICE 7");

h.    Gray PNY 32GB External Storage Device ("SUBJECT DEVICE 8");

i.    Black and Silver imitation 8GB External Storage Device, SBH10260000526 ("SUBJECT DEVICE 9");

j.    HP Computer Tower ("SUBJECT DEVICE 10");

k.    Apple Computer Tower ("SUBJECT DEVICE 11");

l.    Black Logitech External Storage Device, 810-000215, LZ72773 ("SUBJECT DEVICE 12");

m.   Silver Metal "Citibank" External Storage Device ("SUBJECT DEVICE 13");

n.   Black, Green, and Silver 360 Wifi USB Device ("SUBJECT DEVICE 14");

o.   Black and Silver External Storage Device ("SUBJECT DEVICE 15");

p.   MicroSD, 512MB, ATMTLAL76C01641B049695 ("SUBJECT DEVICE 16");

q.   Purple Sony 4MB Memory Stick, MSA-4A, J305Z43 ("SUBJECT DEVICE 17");

r.   Purple Sony 32MB Memory Stick, MSA-M32A, L322Z0A ("SUBJECT DEVICE 18");

s.   Blue SanDisk, 16GB SDHC Card, BL1819351604Z ("SUBJECT DEVICE 19");

t.   Black Canon Multi-Media Card, MMC-16M, HB28H016MM2 ("SUBJECT DEVICE 20");

u.   MicroSD card, 2017-05-28 ("SUBJECT DEVICE 21");

v.   AT&T SIM 89014103243490074736 ("SUBJECT DEVICE 22");

w.   AT&T SIM 89014103270196491492 ("SUBJECT DEVICE 23");

x.   T-Mobile SIM 8901260162757122381 ("SUBJECT DEVICE 24");

y.   Verizon SIM 8931440885419713409 ("SUBJECT DEVICE 25");

z.   240D008930B205 SIM ("SUBJECT DEVICE 26");

       aa.  V SIM, 89148000004296308375 ("SUBJECT DEVICE 27");

       bb.  T-Mobile SIM 8901260185770326077 ("SUBJECT DEVICE 28").

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.  Summary of Probable Cause

10.  NORRIS has felony convictions.  On February 10, 2021, Newport Beach Police Detectives executed a search warrant at NORRIS's residence.  During the execution of the search warrant, detectives located a large plastic storage box in the office. Inside the box, detectives located a GMBH Model 66 .22 caliber Revolver, Serial Number 120811, and a DPMS Rifle lower receiver Model A-15 .223 caliber, Serial Number DM10676K. In addition to the firearms, detectives found a Magpul thirty round rifle magazine loaded with twenty-nine .223 rounds, a Magpul thirty round rifle magazine loaded with seventeen .223 rounds, a Hera Arms thirty round rifle magazine loaded with twenty-eight .223 rounds, and a Metal thirty round rifle magazine loaded with twenty-two .223 rounds.  The box also contained a credit card in NORRIS's name.  In a closet in the office, detectives located nine rounds of loose ammunition of various calibers.  A certified ATF nexus examiner viewed the firearms and the ammunition that was located in NORRIS's apartment.  He found that the firearms and ammunition were manufactured outside of California and therefore had traveled in interstate commerce. Throughout the apartment, detectives also located identity documents, financial documents, and fraudulent checks belonging

to twenty-five different victims.  They also found the SUBJECT DEVICES in the apartment or on NORRIS's person.

**B.   NORRIS's Criminal History**

11.  On March 12, 2021, I reviewed NORRIS's criminal history, as reflected on his National Crime Information Center report, and found the following.  On January 31, 2019, NORRIS was convicted ofthe following felony charges, in case number SBAYA09940001, in California Superior Court, County of Los Angeles:

a.   Grand Theft Auto,in violation of California Penal Codes§ 487(D)(1);

b.   Possession of the Identities of 10+ Persons With the Intent to Defraud, 530.5(C)(3); and

c.   Possession of Metal Knuckles, in violation of California Penal Code § 21810.
NORRIS was sentenced to three years probation and 364 days in jail.

12.  NORRIS is presently on felony probation for his above-referenced January 13, 2019 convictions.

**C.   Newport Beach Police Department Investigation of a Stolen Rental Car**

13.  I have reviewed several Newport Beach Police Department reports concerning an investigation into NORRIS. From those reports, I have learned the following:

a.   On January 4, 2021, a male, later identified as NORRIS, entered the Enterprise Rent-A-Car at 2606 Coast Highway West, Newport Beach, California 92663.  The male completed a

same day vehicle rental for a 2020 GMC Yukon, California license plate 8PGM162, Vehicle Identification Number (VIN) 1GKS1HKJ2LR299876, with a California driver's license and credit card in the name of "Christian Parsons." The California driver's license was scanned into the Enterprise Rent-A-Car system by clerk Dylan Goodman and populated the rental car forms, indicating that the license was legitimate.

b.    The 2020 GMC Yukon was not returned on the return date of January 6, 2021. On January 13, 2021, Enterprise Rent-A-Car sent a demand letter to "Christian Parson" but the vehicle was not returned.

c.    On January 25, 2021, Newport Beach Police Officer D. Maisano took a report from Enterprise Rent-A-Car clerk Goodman regarding the missing 2020 GMC Yukon. Goodman provided Officer Maisano with a digital image of the identification provided by "Christian Parsons." Goodman told Officer Maisano that he would definitely recognize the male who rented the 2020 GMC Yukon if Goodman saw him again. Goodman was able to activate the Onstar Global Positioning System (GPS) on the 2020 GMC Yukon. Officer Maisano responded to the location of the OnStar GPS and found the 2020 GMC Yukon in the underground parking structure of the Eight80 apartment complex, 1815 Sherington Place, Newport Beach, California 92663. The 2020 GMC Yukon was towed by G&W Towing and held for evidence processing by the Newport Beach Police Department.

d.    On January 26, 2021, Newport Beach Police Detective D. Mesri utilized a recent Department of Motor

Vehicles (DMV) photograph of Christian Parsons to create an identification six-pack.

       e.   On January 28, 2021, Detective Mesri and Newport Beach Detective E. Bledstein met with Goodman at Enterprise Rent-A-Car.  Investigator Bledstein, who was not familiar with the underlying case, read Goodman the Witness Admonishments and Instructions and showed the six-pack including the photograph of Christian Parsons in Position 3 to Goodman.  Goodman did not identify Parsons in the six-pack.

       f.   On January 28, 2021, Detective Mesri contacted Christian Parsons via telephone.  Parsons told Detective Mesri that Parsons had renewed his driver's license in September 2020 but had never received the license.  Several months prior to the interview with Detective Mesri, Parsons received a letter from Fox Rent-A-Car regarding a vehicle Parsons had not rented.  Parsons also received a letter from Enterprise Rent-A-Car regarding the 2020 GMC Yukon.  Parsons' credit card statements did not reflect the vehicle rentals.  Parsons said that no one had permission to use his driver's license or credit cards.

       g.   On January 29, 2021, at approximately 12:43 A.M., Newport Beach Police Officer T. Butler stopped a Chevrolet Camaro, California license plate 8JBD669, for swerving between lanes and into the bicycle lane, in violation of California Vehicle Codes 21658(a) and 22107.  The vehicle was a Hertz rental vehicle rented to "Christian Parsons."  The driver of the vehicle was identified as NORRIS.  After confirming that NORRIS was on active probation, Officer Butler conducted a search of

the vehicle.  In the vehicle, Officer Butler located a
California Driver's License and multiple cards for "Christian
Parsons," and a credit card for "Richard Power" associated with
Traci Woodward.  When contacted by telephone, Woodward said she
owns a business and she had multiple fraudulent transactions on
her American Express account. Woodward said she did not know a
"Richard Power" and that NORRIS did not have permission to
possess her documents or documents associated with her business.
NORRIS was placed under arrest for 530.5(E) Possession of Stolen
Mail and 12500(A) Driving Without a License.  During the arrest,
NORRIS was found to be in possession of multiple credit cards in
the name of "Christian Parsons."  One of the credit cards in
NORRIS's possession ended in 4559.  Officer Butler provided the
information regarding NORRIS's arrest to Detective Mesri.
Detective Mesri viewed a photograph of the "Christian Parsons"
license provided by NORRIS during the stop.  The license had an
issue date of August 21, 2020 and appeared to be the September
2020 license Parsons never received.  Detective Mesri utilized
NORRIS's mugshot from Officer Butler's arrest to create an
identification six-pack including NORRIS.

        h.    On January 29, 2021, Detective Mesri and Newport
Beach Police Officer Adame went to Enterprise Rent-A-Car to meet
with Goodman.  Officer Adame, who was not familiar with the
underlying investigation, read Goodman the Witness Admonishments
and Instructions and showed the identification six-pack,
including NORRIS in position #2, to Goodman.  Goodman selected
NORRIS's photograph from the six photographs and said, "I'm

pretty sure this is him."  Goodman was 75% certain that NORRIS
was the male who rented the 2020 GMC Yukon on January 4, 2021 at
Enterprise Rent-A-Car.  Goodman confirmed that the January 4,
2021 vehicle rental was made with a credit card ending in 4559.

      i.  On February 5, 2021, Newport Beach Police
Detective R. O'Brien obtained a GPS ping warrant for (949) 705-
9403, a telephone number belonging to NORRIS.  The warrant was
signed by the Honorable Craig E. Robison, Orange County Superior
Court Judge.  The GPS ping showed NORRIS staying at the Eight80
Apartment Complex, 1815 Sherington Place, Newport Beach,
California 92663.  Newport Beach Police conducted surveillance
at the Eight80 Apartment Complex.  During the surveillance,
Detective Cooke observed NORRIS standing on the patio of
Apartment VS215.  Sergeant Short contacted the leasing office
for Eight80 and was informed that Apartment VS215 was rented to
a "Brian Surgener."  The apartment had a $15,000 outstanding
balance in the name of "Brian Surgener."

      j.  On February 9, 2021, Newport Beach Police
Detective M. Fasano contacted Brian Surgener by telephone.
Surgener told Detective Fasano that Surgener had never signed a
lease for an apartment in the Eight80 Apartment Complex.
Surgener lived at an address in Ladera Ranch, California.  In
August 2019 Surgener lost his wallet, which contained
identification documents and credit cards.  Surgener said that
he had been dealing with identity fraud problems ever since, and
had filed a report with the Orange County Sheriff's Department,
DR 20-33813.

**D.   Firearms, Ammunition, and Identity/Financial Documents Found in Search Warrant at NORRIS's Residence**

14.   I also learned the following from the Newport Beach Police Department reports concerning the investigation into NORRIS.

a.   On February 10, 2021, the Honorable Richard Pacheco, Orange County Superior Court Judge, signed a search warrant for 1815 Sherington Place, Apartment VS215, Newport Beach, California 92663.  In addition to the search warrant, NORRIS was on formal probation with search and seizure conditions.  As Newport Beach Police Officers approached Apartment VS215, Detective Aguilar observed NORRIS exit apartment VS215 and stand in front of the door.  Detective O'Brien approached and observed NORRIS standing by the door to Apartment VS215 looking down at a cellular telephone.  Detectives took NORRIS into custody and searched his person.  SUBJECT DEVICE 1 and a key to a storage box were found on NORRIS.

b.   During the search of Apartment VS215, Sergeant Short located a large, locked, plastic storage box in the apartment's office.  Detective Fasano used bolt cutters to open the box.  Inside the plastic storage box was a cardboard box.  Inside the cardboard box, Sergeant Short located the following:

i.   a Rohm GMBH Model 66 Revolver, .22 caliber, Serial Number 120811;

ii.   a DPMS Model A-15 .223 Caliber Rifle lower receiver, Serial Number DM10676K;

iii. a Magpul thirty round rifle magazine containing twenty-nine .223 rounds;

iv.  a Magpul thirty round rifle magazine containing seventeen .223 rounds;

v.   a Hera Arms thirty round rifle magazine containing twenty-eight .223 rounds; and

vi.  a Metal thirty round rifle magazine containing twenty-three .223 rounds.

c.    There was also a credit card in the name of "Wesley Norris" inside the cardboard box.  The key to a storage box found on NORRIS's person during his arrest matched the lock on the plastic storage box.  On February 11, 2021, the firearms were processed for latent fingerprints and swabbed for DNA by Detective D. Fitzgerald.

d.    Also during the search of Apartment VS215, in the office, detectives located SUBJECT DEVICES 2 through 9 and SUBJECT DEVICES 12 through 28.

e.    Detectives found a number of miscellaneous items in the office, including a United States Postal Service letter addressed to NORRIS in Apartment VS215, and a number of burglary tools, to include a vehicle lock out kit, a pry bar, bolt cutters, wire cutters, and a window punch.

f.    In a closet in the office, there was a rifle upper receiver, a .45 caliber round, three loose .223 rounds, a .38 Special round, and four loose .30 caliber rounds.

g.    Detective O'Brien examined the upper and lower rifle receivers discovered separately in the office.  Detective

13

O'Brien determined that the receivers fit together to form an assault rifle.  Detective O'Brien put the pieces together and conducted a successful function check.

h.   Throughout the apartment, detectives located evidence of fraudulent activity, including fake United States Currency totaling $4277, blank check paper, an embosser, two MSRX6 card scanners, a Magtek card scanner, six PayPal card readers, and a Zebra card press. Detectives also located SUBJECT DEVICES 10 and 11 within the apartment.

i.   The following identity and financial documents were discovered in the apartment during the search:

i.   <u>Rachel Lea Cruz</u>

(I)   A Wells Fargo Bank check Number 227 in the names of Rachel Lea Cruz and Wesley Norris was found in NORRIS's apartment.

(II) On February 11, 2021, Detective S. Sa spoke to Rachel Lea Cruz by telephone.  Cruz said that she was divorced from NORRIS in 2015.  Cruz was contacted by Trader Joe's in April 2020 regarding NORRIS using their old checks to make purchases.  Cruz said the Wells Fargo Bank account for their marriage was closed after the divorce and that NORRIS had no authority to continue using the checks.  Cruz reported the use of the checks to the Riverside County Sherrif's Office, DR EV201650058.

ii.   <u>Christian Parsons</u>

(I)   A fraudulently created check issued to "Christian Parsons" from the State of California in the amount

of $431, Check Number 1716, was located in NORRIS's apartment. The check was clearly fraudulent based on the odd coloring.  The check was not endorsed or negotiated.

### iii. Brian Surgener

(I)  A Mastercard, Serial Number ending in 6450, in the name of Brian Surgener,was located in NORRIS's apartment.

(II) On February 10, 2021, Detective Fasano spoke with Surgener by telephone.  Surgener confirmed that NORRIS did not have permission to have Surgener's credit card.

### iv.  Nathaniel Sutterfield

(I)  A Chase Bank checkbook for Nathaniel Sutterfieldwas located in NORRIS's apartment. The checkbook started at check 129.

(II) On February 10, 2021, Detective Fasano spoke with Sutterfield by telephone.  Sutterfield said that the account associated with that check was still open.  Sutterfield was alerted approximately three to four months prior that someone attempted to cash check number 128 in the amount of $250.  Sutterfield declined the transaction.  Sutterfield said that NORRIS did not have permission to possess his checkbook.

### v.   Christopher Velarde

(I)  A check payable to Christopher Velarde was located in NORRIS's apartment.

(II) On February 10, 2021, Detective Fasano spoke to Velarde by telephone.  Velarde said that the check had

been stolen from his doorstep.  The company issued Velarde a new check and was not sure what happened to the missing check.

vi.  Rose Shapiro

(I)  Bank statements for a Union Bank account in the name of Rose Shapiro.

(II) On February 10, 2021, Detective Fasano spoke to Shapiro by telephone.  Shapiro said that she had not had any fraudulent activity on her account.

vii. Erica Gushue

(I)  Three Bank of America checks, numbers 407, 408, and 409, belonging to Erica Martin were located in NORRIS's apartment.

(II) On February 11, 2021, Detective Sa spoke to Erica Gushue (nee Martin) by telephone.  Gushue stated that those checks belonged to an active account belonging to her.  Gushue did not know how NORRIS obtained her checks and said that NORRIS did not have permission to have them.

viii.   Demarcus Gilliard

(I)  A Chase Bank checkbook belonging to Demarcus Gilliard was located in NORRIS's apartment.  The checkbook was missing several checks and started with check number 132.

(II) On February 11, 2021, Detective M. Hampton, Serial Number 1409, spoke with Demarcus Gilliard by telephone.  Gilliard confirmed that he had a Chase Bank account with the same address on the checks.  Gilliard was unaware the

checks were missing.  Gilliard said that NORRIS did not have
permission to have the checkbook.

ix.  Weiyi Ni and Fang Meng

(I)  A Bank of America checkbook belonging
to Weiyi Ni and Fang Meng was located in NORRIS's apartment.

(II) On February 11, 2021, Detective Hampton
spoke with Weiyi Ni and Fang Meng by telephone.  Ni and Meng
confirmed that they were married.  Ni had ordered checks from
Bank of America in August 2019 but Ni never received them.  Ni
reported the incident and Bank of America cancelled the checks.
Ni and Feng said that NORRIS did not have permission to possess
their checkbook.

x.  Noah Blom

(I)  A Bank of America check belonging to
The New Wild Rides, Inc. made out to Noah Blom for $1200 on
April 8, 2020.

(II) On February 11, 2021, Detective Hampton
spoke to Blom by telephone.  Blom did not recognize the check or
the check issuer.  Blom said that his wallet was stolen from his
vehicle in November 2019.

(III)    On February 11, 2021, Detective
Hampton spoke to the owner of The New Wild Rides, Inc., Gene
Giroud, by telephone.  The New Wild Rides, Inc. is located in
Farmingdale, New Jersey.  Giroud said that the check was issued
to Pro Media in California.  Giroud viewed a photograph of the
check by email and confirmed that the check had been washed and

forged.  Giroud said that NORRIS did not have permission to have his check.

xi. <u>Daniel Winant</u>

(I)  Two W-2 Forms belonging to Daniel Winant were located in NORRIS's apartment.

(II) On February 10, 2021, Detective O'Brien spoke to Winant by telephone.  Winant confirmed that NORRIS did not have permission to have his documents.

xii. <u>John Sheldon Kaplan</u>

(I)  Three personal identity documents belonging to John Sheldon Kaplan, two W-2 documents and one tax income form, were located in NORRIS's apartment.

(II) On February 10, 2021, Detective O'Brien spoke to Kaplan by telephone.  Kaplan confirmed that NORRIS did not have permission to have his documents.

xiii.   <u>Jason Boone</u>

(I)  A Mastercard in the name of Jason Boone was located in NORRIS's apartment.

xiv. <u>Lynette Hernandez</u>

(I)  Personal information and documents belonging to Lynette Hernandez were located in NORRIS's apartment.

(II) On February 11, 2021, Detective T. Cookespoke with Hernandez by telephone.  Hernandez said that an office she worked for in Santa Ana was burglarized in 2020. Hernandez said several of her personal documents and tax forms

were stolen during the incident.  Hernandez said that NORRIS did
not have permission to have her documents or information.

           xv.  <u>ProMedia LLC</u>

           (I)  Four checks payable to ProMedia were
found in NORRIS's apartment.  The checks were in various stages
of alteration: (1) Check Number 72696 for $650 dated April 3,
2020 from Competition Products payable to ProMedia; (2) Check
Number 39013 for $700 on April 1, 2020 from Good Vibrations
Racing; (3) Check Number 23793 for $1000 on April 2, 2020 from
ATI Performance Products, Inc.; and (4) Check Number 11883 for
$500 from Optic Armor LLC payable to ProMedia.

           (II) On February 11, 2021, Detective
Bledstein spoke to the General Manager of ProMedia LLC, Rollie
Miller, by telephone.  Miller said that any missing checks for
his company probably resolved themselves by sending past due
notices or requesting reissued checks.  Miller said that NORRIS
did not permission to have possession of any checks related
ProMedia.

           xvi. <u>Joseph Castellon</u>

           (I)  A black and white birth certificate
copy belonging to Joseph Castellon was located in NORRIS's
apartment.

           (II) On February 11, 2021, Detective
Bledstein spoke to Castellon by telephone.  Castellon said that
his birth certificate had been in his mother's office.
Castellon said that his mother had a break-in a year prior.
Following the break-in, Castellon had a number of unauthorized

charges on his credit card online.  Castellon said NORRIS did
not have permission to have his birth certificate.

xvii.    <u>Lisa Slater</u>

(I)  A check in the amount of $1480.56 from
Hoag Clinic payable to Lisa Slater.

(II)  On February 11, 2021, Detective
Bledstein spoke to Lisa Slater by telephone.  Slater said that
she remembered not receiving the check from Hoag because she had
been waiting for it.  Slater had the check reissued when it did
not arrive.  Slater said NORRIS did not have permission to have
her check.

xviii.    <u>Kevin Almandrez</u>

(I)  A Barclays Bank check belonging to
Kevin Almandrezwas located in NORRIS's apartment.

(II)  On February 11, 2021, Newport Beach
Police Detective E. Geoffroyspoke to Kevin Almandrez by
telephone.  Almandrez said that the check belonged to him.
Almandrez advised that he had been the victim of multiple
vehicle thefts.  Almandrez said that NORRIS did not have
permission to have his check.

xix. <u>Diego Segura</u>

(I)  Ten checks issued to Orange County
Collision and Glass Center were located in NORRIS's residence.

(II)  On February 11, 2021, Detective
Geoffroy spoke with the owner of Orange County Collision and
Glass Center, Diego Segura, by telephone.  Segura said the

checks belonged to an account that was closed.  Segura said that NORRIS did not have permission to have the checks.

xx.  Machinery Components, Inc.

(I)  A check written from Machinery Components, Inc. to Pro Media was located in NORRIS's apartment.

(II) On February 11, 2021, Detective Geoffroy spoke with the Accounting Controller for Machinery Components, Inc., Betty Baldwin, by telephone.  Machinery Components, Inc. is located in West Chicago, Illinois.  Baldwin said that the check had been written to their customer, Pro Media, but the check never arrived and was eventually voided. Baldwin said that NORRIS did not have permission to have the check.

xxi. Robert Wilkes

(I)  An expired United States passport belonging to Wilkes, as well as mail, a W-9 form, and multiple photocopies of Wilkes' passport, California Driver License, and Social Security Card were located in NORRIS's apartment.

(II) On February 10, 2021, Detective Mesri spoke to Robert Wilkes by telephone.  Wilkes said that no one had permission to have the items recovered.

xxii.   Elizabeth Wilkes

(I)  Photocopies of a United States passport, California Driver License, and Social Security Card belonging to Wilkes were located in NORRIS's apartment.

(II) On February 10, 2021, Detective Mesri spoke to Elizabeth Wilkes by telephone.  Wilkes said that no one had permission to have the items recovered.

xxiii.    <u>James Paul</u>

(I)  A check belonging to James Paulwas located in NORRIS's apartment.  The check was signed and the pay to the order of and dollar amount was written, but the writing was faded.  The check appeared to be re-written over the date, signature, and partial portion of the dollar amount.

(II) On February 10, 2021, Detective Mesri spoke to James Paul by telephone.  Paul said that he had filled out the check and mailed it to NMCA but that the check had never been cashed.  Paul said that NORRIS did not have permission to have the check.

xxiv.    <u>Katie Stricklin</u>

(I)  A current United States Passport belonging to Katie Stricklin was located in NORRIS's apartment.

(II)  On February 10, 2021, Detective Mesri spoke to Katie Stricklin by telephone.  Stricklin said that her passport was stolen from her vehicle on October 27, 2020 in a window smash vehicle burglary in Huntington Beach, #20-0011977. Stricklin said that NORRIS did not have permission to have her passport.

xxv. <u>Various Checks</u>

(I)  Five checks made out to (1) Burton Family Trust in the amount of $5000, (2) Karen Wences in the amount of $20, (3) Holly Ramstead in the amount of $75, (4) John

22

R. and Beverly E. Owen in the amount of $602, and (5) Eric
Stanton-Hoyle in the amount of $883.04.

                      xxvi.    Various Vehicle Itms

                        (I)   Seven California license plates, five
vehicle registrations in other people's names, one fraudulent
vehicle registration, and one driver's license in the name of
Kristian Sabatino.

15.  Following the search warrant, NORRIS was arrested for
violations of 459 Commercial Burglary, Cal. Penal Code ("CPC")
§ 530.5(C)(3) Possession of 10 or More Identification Documents,
CPC § 530.5 (C)(2) Use of Others Identification Documents with
Intent to Defraud, CPC § 496(A) Receiving Stolen Property, CPC
§ 29800(A)(1) Felon in Possession of a Firearm, CPC § 21510(B)
Carry Switchblade Knife on Person, CPC § 32310 Possession of
Large Capacity Firearm, CPC § 30305(A) Possession of Ammunition
by Prohibited Person, CPC § 30605 Possession of Assault Weapon,
CPC § 21510(A) Possession of Switchblade in a Vehicle,
California Health and Safety Code § 11350(A) Possession of
Controlled Substance, and CPC § 22610(A) Felon in Possession of
a Stun Gun.

        **E.  NORRIS's Statement**

16.  Also from reviewing the Newport Beach Police
Department reports, I learned the following.  Following the
search warrant, NORRIS spoke to Newport Beach Police officers.
NORRIS denied any involvement with activity related to an
Enterprise Rent-A-Car.  He further stated he knew Christian
Parsons through a girl they were both friends with, but was

unable to provide a name or phone number for the girl.  He stated he was currently subleasing apartment VS215 from Brian Surgener.  He could not provide contact information for Surgener.

**F.    Interstate Nexus**

17.    On March 12, 2021, FBI Special Agent Trevor Twitchell, who is a certified ATF interstate nexus examiner, examined the firearms and ammunition located in NORRIS's apartment.  Special Agent Twitchell confirmed that the firearms and ammunition were manufactured outside of California.  Because the firearms and ammunition were found in California, it is Special Agent Twitchell's opinion that the firearms and ammunition traveled in and affected interstate commerce.

**V.    TRAINING AND EXPERIENCE ON FIREARMS AND FRAUD OFFENSES**

18.    From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other

individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that they sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

d.   Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

e.   Persons engaged in a large amount of fraudulent activity will have records of their fraudulent activity in the history of their digital devices, to include an internet history of logging into various bank accounts, photographs of forged checks and documents, and searches for means/methods to conduct fraudulent activity.

19.  Digital devices also carry location information that can place the user of those devices in specific locations relevant to thefts leading to the possession of identity documents.

### VI. **TRAINING AND EXPERIENCE ON DIGITAL DEVICES**

20.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

21.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

22.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.   Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

23.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

        a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices to be searched.

c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device; here, I believe NORRIS to be the user of all of the SUBJECT DEVICES.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress NORRIS's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of NORRIS's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

24.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII.   ITEMS TO BE SEIZED

25.   Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence of violations of the Subject Offenses, will be found on the SUBJECT DEVICES.

### VIII.      CONCLUSION

26.   Additionally, for all the reasons described above, there is probable cause to believe that NORRIS has committed a violation of Felon in Possession of a Firearm and Ammunition, 18 U.S.C. § 922(g)(1).


/s/
_____
Meagan M. Buckley, Special
Agent
Federal Bureau of
Investigation


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
March 2021.


**DOUGLAS F. McCORMICK**
_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE